George T. FRANKLIN, Petitioner,

v.

Carl S. ANDERSON, Warden,
Respondent.

No. C–1–95–1007.

United States District Court,
S.D. Ohio,
Western Division.

March 31, 2003.

Wayne Paul Stephan, Flanagan, Lieberman, Hoffman & Swaim, Dayton, OH, David Bodiker and Stephen A. Ferrell, Ohio Public Defender's Office, Columbus, OH, for Petitioner.

Charles L. Wille, Assistant Attorney General, Jonathan R. Fulkerson, Ohio Attorney General, and Heather L. Gosselin, Assistant Attorney General, Capital Crimes Section, Columbus, OH, for Respondent.

Decision and Entry Overruling Respondent's Objections (Doc. # 106) to Report and Recommendations of Magistrate Judge (Doc. # 105); Decision and Entry Overruling Petitioner's Objections (Doc. # 108) to Report and Recommendations of Magistrate Judge (Doc. # 105); Decision and Entry Overruling Petitioner's Objections (Doc. # 114) to Amended Supplemental Report and Recommendations of Magistrate Judge (Doc. # 112); Report and Recommendations of Magistrate Judge (Doc. # 105) Adopted, as Supplemented Herein; Amended Supplemental Report and Recommendations of Magistrate Judge (Doc. # 112) Adopted, as Supplemented Herein; Conditional Writ of Habeas Corpus Granted; Certificate of Appealability Granted; Leave to Appeal in Forma Pauperis Granted; Judgment to be Entered in Favor of Petitioner and Against Respondent on the Sixth Claim and a Portion of the First Claim and in Favor of Respondent and Against Petitioner on the Remaining Claims; Termination Entry.

RICE, Chief Judge.

Petitioner George Franklin ("Franklin" or "Petitioner") was charged with one count of aggravated murder, with death penalty specifications, arising out of the homicide of Gerald Strauss ("Strauss"), as well as two counts of burglary. His case was assigned to Judge Ralph Winkler of the Hamilton County Common Pleas Court. On December 7, 1988, a jury in Hamilton County convicted him of those offenses. On December 12, 1988, the penalty phase of Franklin's trial occurred, with the jury finding that the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors and returning a recommendation that the death penalty be imposed. Thereafter, Judge Winkler conducted his own independent review of the evidence and found that the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Accordingly, the trial court sentenced Franklin to death.

In accordance with Ohio law as it then stood, Petitioner appealed to the Hamilton County Court of Appeals. That appellate court rejected Franklin's assignments of error and, after conducting its own independent review of the evidence, concluded that the state had proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. *State v. Franklin*, 1990 WL 117140 (Ohio App.1990). Thus, the court of appeals affirmed Franklin's conviction and the death penalty imposed upon him. The Petitioner appealed that decision to the Ohio Supreme Court, which affirmed the Hamilton County Court of Appeals. *State v. Franklin*, 62 Ohio St.3d 118, 580 N.E.2d 1 (1991), *cert. denied*, 504 U.S. 960, 112 S.Ct. 2315, 119 L.Ed.2d 235 (1992). The Ohio Supreme Court also independently weighed the aggravating circumstances and mitigating factors, concluding that the state had met its burden of proof in that regard. In its decision, the Ohio Supreme Court summarized the facts and circumstances surrounding the crimes for which the Petitioner was convicted:

About 4:00 p.m. on July 21, 1988, Rosha Winston returned to her one-room apartment on Eden Avenue in Cincinnati to find that her TV set had been taken. A framed picture and some decorative glass dishes had been moved from the top of the TV and placed on the kitchen table. A window screen at the rear of the apartment had been partly

torn out and the windowsill had mud on it.

The window that had a torn screen was about six feet off the ground from the outside. Police noticed a circular imprint made in the muddy ground under the window. The circle was thought to have been made by a metal garbage can, on which the burglar stood to reach the window. Several metal cans sat on concrete across the driveway separating Winston's apartment from the building next door. One of the cans had mud around the top. A large barking dog, chained to a nearby handrail, prevented police from approaching the cans.

Winston told police she suspected George Franklin, a neighbor, of the burglary. Franklin lived in an apartment next door with his grandfather. When questioned by police on the same day as the burglary, Franklin used the name of George Fichtel. Franklin appeared nervous, and wanted to know what evidence the police had. He admitted that the dog belonged to his grandfather, and controlled it long enough for the officer to inspect the garbage cans.

Police found Franklin's fingerprint on the picture that had been on top of the stolen TV. By the time police identified Franklin as the burglar, he had disappeared.

On or about July 23, 1988, Gerald R. Strauss and his fiancee Karen Strain moved into a townhouse on Corry Street in Cincinnati. On Saturday, August 6, 1988, Strauss and Strain picked up Richard Thompson, a friend of Strauss, at the airport. The next morning, Strain left on a business trip. Thompson and Strauss spent the day in various activities, including a cookout on the apartment patio. Strauss dropped Thompson off in downtown Cincinnati at around 10:00 that evening.

At about 10:30 p.m. a neighbor, Leonard Bass, saw Strauss cleaning the patio and apartment. Shortly after 11:00 Bass saw Strauss go upstairs, and saw lights turned off in the apartment. Another neighbor, Catherine Schaffner, while out walking her dog between 11:00 and 11:30, heard a "horrible," "very loud, very forceful" scream that lasted two or three seconds. The sound seemed to come from the direction of Strauss's building. A few minutes later, after Schaffner got home, her dog started barking which usually indicated a stranger passing close to the house.

The next morning Mitch Walker, a coworker at Proctor & Gamble, tried to call Strauss when he did not show up for work. After getting busy signals, Walker asked the operator to break in. The operator determined that the phone was off the hook. Walker then drove to Strauss's townhouse, and found the front door ajar. He asked a police officer to investigate. The officer entered the townhouse and found Strauss's body in an upstairs bedroom.

The coroner arrived that morning and concluded that Strauss had been dead six to eighteen hours. Upon laboratory examination, the body revealed bruises on the right hand; lacerations, broken bones and a crushed eyeball from two blows to the face; and lacerations and broken bones from a large number of blows to the back of the head. The cause of death was bone fragments driven into the brain. The wounds were described by the coroner as consistent with having been caused by a claw hammer.

According to both Thompson and Strain, Strauss had left a Marion brand claw hammer in the upstairs guest bedroom. The hammer was not found in the house. Other items were missing

from the house, including Strauss's money clip with several twenties, his credit cards, his watch, a VCR, and a briefcase with personal papers. In a wooded area a few blocks away, police found the briefcase and personal papers, credit cards, and a placemat that matched others in the townhouse. Assisted by a tracking dog, the police found a blood-stained Marion brand claw hammer in the woods. The VCR, watch, money clip and money were never recovered, despite the offer of a reward.

A screen had been torn out in a patio window of the townhouse. Karen Strain testified that she and Strauss kept an empty champagne bottle as a souvenir on the inside sill of that window. When police found the body, the bottle had been carried upstairs and left in the guest bedroom.

The police noticed a similarity to the Winston burglary. Both crimes occurred in the same neighborhood, within seventeen days of each other. A TV was taken from Winston, a VCR from Strauss, and both entries had been obtained by tearing or cutting a screen from a rear window. A latent fingerprint lifted from the champagne bottle in the Strauss townhouse matched Franklin's known prints.

Police traced Franklin to the apartment of a Glenn Davis. When officers arrived on August 18, Davis answered the door and said he lived there with his cousin, Gerald Evans. The police recognized "Gerald Evans" as Franklin and arrested him.

Michael Turnbolt, who spent the evening of the Strauss murder, August 7, with Franklin, testified that both had been using drugs. Franklin left at about 10:30 p.m., at which time he apparently had no money. Franklin returned and woke Turnbolt at about 2:30 a.m. Turnbolt described this as unusual. Franklin had changed his shirt, and had $100 to $150, which he later used to purchase a gram of cocaine.

*Id.* at 118–20, 580 N.E.2d at 3–4.

Thereafter, Franklin continued to attempt to secure relief in the Ohio courts, by seeking post-conviction relief pursuant to Ohio Revised Code § 2953.21, as well as by requesting that the Ohio Supreme Court recall its mandate and permit supplemental briefing. The Ohio Supreme Court denied Petitioner's requests, without an opinion. *State v. Franklin,* 63 Ohio St.3d 1402, 585 N.E.2d 424 (1992). In addition, Franklin's petition for post-conviction relief was denied by the Hamilton County Common Pleas Court without an evidentiary hearing, a decision which was affirmed by the Hamilton County Court of Appeals. *See State v. Franklin,* 1995 WL 26281 (Ohio App.), *appeal not allowed,* 72 Ohio St.3d 1538, 650 N.E.2d 479, *cert. denied,* 516 U.S. 950, 116 S.Ct. 394, 133 L.Ed.2d 315 (1995).

After having exhausted his available state remedies, Petitioner initiated this action, requesting a writ of habeas corpus, alleging that his convictions and sentences violated a number of provisions of the United States Constitution. In his Petition (Doc. # 5) and Amended Petition (Doc. # 25), the Petitioner set forth 28 separate grounds or claims for relief. This Court referred the matter to Magistrate Judge Michael Merz for a Report and Recommendations. On August 21, 2002, after having conducted an evidentiary hearing, Judge Merz issued his Report and Recommendations. *See* Doc. # 105. In particular, that judicial officer recommended that the Court grant the requested writ of habeas corpus on the Sixth Claim and that it deny such relief with

respect to the other 27 claims.[1] Both the Respondent (Doc. # 106) and the Petitioner (Doc. # 108) filed Objections to that judicial filing.[2] Thereafter, Judge Merz filed an Amended Supplemental Report and Recommendations,[3] in which he reaffirmed his earlier judicial filing and recommended that the Court overrule both parties' Objections. *See* Doc. # 112. The Petitioner, in turn, filed Objections to the Amended Supplemental Report and Recommendations of the Magistrate Judge. *See* Doc. # 114.

The Court begins by setting forth the standard of review it must apply when it reviews Reports and Recommendations of a Magistrate Judge in a habeas corpus proceeding. The Sixth Circuit has indicated that a District Court must apply a *de novo* standard of review to such a judicial filing. *Flournoy v. Marshall,* 842 F.2d 875 (6th Cir.1988). Accordingly, this Court reviews both Judge Merz' factual findings and his legal conclusions *de novo.*

Herein, the Court rules upon the parties' Objections to the Report and Recommendations and the Petitioner's Objections to the Amended Supplemental Report and Recommendations. In addition, the Court decides whether Petitioner is entitled to a certificate of appealability on any claims upon which he is deemed to be not entitled to relief. The requirement for such a certificate is found in 28 U.S.C. § 2253(c), which provides:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

---

**1.** With his Sixth Claim, the Petitioner alleged that his convictions and sentences are unconstitutional, as a result of the fact that one of the jurors was biased, rather than being impartial. Although the Petitioner had not raised that claim during his direct appeals, Judge Merz concluded that this claim was not barred by procedural default, because Petitioner's appellate counsel were constitutionally ineffective as a result of their failure to raise that issue during Petitioner's direct appeals. The ineffective assistance of counsel provided cause and prejudice, excusing the procedural default. With his First Claim, the Petitioner asserted that his convictions and sentences violated the constitution because of the failure of his appellate counsel to render effective assistance. The First Claim was based, *inter alia,* upon the failure of appellate counsel to raise the issue of the biased juror during his direct appeals. Judge Merz also recommended that the Court grant Petitioner the requested relief on that aspect of his First Claim. Judge Merz also noted that appellate counsel had failed to consult with their client and by failing to afford him an opportunity to have input in his appeals. Since both this aspect of the Petitioner's First Claim and his Sixth Claim are predicated upon the assertions that he was denied effective assistance by his appellate counsel and that his constitutional right to an impartial jury was infringed by the presence of a biased juror on the panel which convicted him and recommended that he be sentenced to death, the Court will discuss those issues only in connection with the Sixth Claim. If it concludes that the Petitioner is entitled to the requested relief on his Sixth Claim, it will also award him relief on the corresponding aspect of his First Claim, without expressly discussing that claim further.

**2.** Each of the parties filed a memorandum in opposition to the other's Objections. *See* Docs. # 109 (Respondent's Reply to Petitioners Objections) and # 110 (Petitioner's Reply to Respondent's Objections).

**3.** That judicial filing was preceded by Judge Merz's Supplemental Report and Recommendations (Doc. # 111). Since Judge Merz's Amended Supplemental Report and Recommendations (Doc. # 112) superceded his Supplemental Report and Recommendations (Doc. # 111), the Court does not discuss the latter filing further.

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In *Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), the Supreme Court explained that an applicant for a certificate of appealability could make "a substantial showing of the denial of a constitutional right," as required by § 2253(c)(2), in accordance with the standard adopted in *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).[4] 529 U.S. at 483–84, 120 S.Ct. 1595. The *Slack* Court explained that when the District Court has rejected a petitioner's constitutional claim on the merits, he must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484, 120 S.Ct. 1595. With respect to instances in which the District Court denies relief on procedural grounds, the *Slack* Court held:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether

the district court was correct in its procedural ruling.

*Id.* In *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), the Supreme Court reaffirmed the standards for the granting of a certificate of appealability that had been established in *Slack.*

Initially, this Court must decide whether the version of 28 U.S.C. § 2254(d), added by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, is applicable herein. In *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the Supreme Court held that the amended version of § 2254(d) did not apply to a request for habeas corpus which was already pending on the day that the AEDPA became effective, April 24, 1996. Herein, Franklin's request for such relief was pending on that date, given that he filed his Petition for a Writ of Habeas Corpus (Doc. # 5) on November 14, 1995. Consequently, the version of § 2254(d) added with the AEDPA is inapplicable, and this Court applies the pre-amendment version of § 2254(d). In *Mapes v. Coyle*, 171 F.3d 408 (6th Cir.), *cert. denied*, 528 U.S. 946, 120 S.Ct. 369, 145 L.Ed.2d 284 (1999), the Sixth Circuit reiterated that under the pre-AEDPA version of § 2254(d), state court findings of historical facts are presumed to be correct and are rebuttable only in certain circumstances. *Id.* at 413. Moreover, an individual seeking a writ of habeas corpus must rebut the presumption of correctness by clear and convincing evidence. *Id.*

As a means of analysis, the Court will initially rule upon Petitioner's Objections,

---

**4.** In *Slack*, the Supreme Court also held that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), with its requirement that a petitioner obtain a certificate of appealability, was applicable when a appeal was sought after the effective date of that statute, even though the petition for a writ of habeas

corpus had been requested before that effective date. 529 U.S. at 481–82, 120 S.Ct. 1595. Since an appeal of this Court's decision will occur after the effective date of the AEDPA, the requirement that a certificate of appealability be obtained is applicable herein.

following which it will turn to those submitted by the Respondent. However, since there is a question as to whether the Petitioner's claims are barred by procedural default, the Court will set forth the standards it must apply to decide whether a claim is barred by the doctrine of procedural default, before addressing the Objections.

## I. Standards to Determine Procedural Default

■ In *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Supreme Court held that, in the absence of cause and prejudice, a District Court cannot grant a writ of habeas corpus, when the state courts have refused to address the merits of a federal constitutional argument, on the ground that the defendant failed to follow a state procedural requirement. Thus, in *Boyle v. Million,* 201 F.3d 711, 716 (6th Cir.2000), the Sixth Circuit noted that "[w]e have consistently held that, absent cause and prejudice, 'a federal habeas corpus petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review.' " *Gravley v. Mills,* 87 F.3d 779, 784–85 (6th Cir.1996). In *Wickline v. Mitchell,* 319 F.3d 813 (6th Cir.2003), the Sixth Circuit reiterated the four part test, adopted in *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986), by which a court determines whether a claim has been procedurally defaulted:

> First, the court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and with which the petitioner failed to comply. [*Maupin,* 785 F.2d] at 138. "Second, the court must decide whether the state courts actually enforced the state procedural sanction." *Id.* Third, the

court must determine whether the state procedural rule "is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim." *Id.* (internal quotation marks omitted). "A procedural rule is adequate only when it is firmly established and regularly followed at the time it was applied .... [and is] an independent basis for disposition of a case if the state courts actually relied on the procedural bar." *Williams v. Coyle,* 260 F.3d 684, 693 (6th Cir.2001). Finally, if the court answers the first three questions in the affirmative, it will not review the procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and actual prejudice resulting from the alleged constitutional violation. *Maupin,* 785 F.2d at 138–39.

*Id.* at 818 n. 2. *Accord, Jamison v. Collins,* 291 F.3d 380, 385–86 (6th Cir.2002); *Cooey v. Coyle,* 289 F.3d 882, 897–98 (6th Cir. 2002). This Court must look to the last, explained state court decision to determine whether a claim has been procedurally defaulted. *Wickline,* 319 F.3d at 818.

## II. Petitioner's Objections (Doc. # 108) to Report and Recommendations (Doc. # 105) and Petitioner's Objections (Doc. # 114) to Amended Supplemental Report and Recommendations (Doc. # 112)

As is indicated above, the Magistrate Judge recommended that this Court deny 27 of Petitioner's 28 claims. The Petitioner has objected to the Magistrate Judge's recommendations concerning six of his claims. He has not objected to Judge Merz' recommended denial of the Fourth, Seventh, Ninth through Twelfth, Fourteenth through Nineteenth and Twenty–First through Twenty–Eighth Claims.[5]

---

**5.** As is indicated previously, Judge Merz rec-

ommended that the Court grant relief to the

Based upon its own, independent review of the record, this Court concurs with Judge Merz's recommendation that the Petitioner be denied relief on those 20 claims. Accordingly, the Court adopts the Report and Recommendations (Doc. # 105), as that judicial filing relates to the Petitioner's Fourth, Seventh, Ninth through Twelfth, Fourteenth through Nineteenth and Twenty–First through Twenty–Eighth Claims. In addition, since the Petitioner has not shown that reasonable jurists would find this Court's assessment of those 20 claims debatable or wrong, the Court will not award a certificate of appealability for any one or more or all of those 20 claims.[6]

The Petitioner has objected to the Initial and Amended Supplemental Reports and Recommendations with regard to the Second, Third, Fifth, Eighth, Thirteenth and Twentieth Claims. As a means of analysis, the Court addresses the parties' argument relating to those six claims in the above order, discussing the Eighth and Thirteenth Claims together, as does Franklin.

*A. Second Claim*

With this claim, Petitioner contends that his convictions and sentences were obtained in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, because the attorneys representing him during his trial failed to provide effective assistance of counsel. In his Objections, the Petitioner contends that the performance of his trial counsel was deficient in preparation for the guilt phase of his trial, because they failed to canvass the neighborhood where Strauss lived and was murdered. Doc. # 108 at 1–3; Doc. # 114 at 2–4. According to Franklin, such a canvassing would have led to the discovery of Jay Lazarus, who would have testified that he had seen someone on the east side of Strauss' condominium around the time that he was murdered and that he thinks he saw another individual in the vicinity of Strauss' condominium later that night. *Id.* Petitioner states that neither of the individuals seen by Jay Lazarus looked like him. In addition, Petitioner contends that his trial counsel was ineffective because they failed to obtain an expert who could have challenged the Prosecution's evidence relating to the fingerprint retrieved from the champagne bottle in Strauss' condominium. Doc. # 108 at 3–6; Doc. # 114 at 4–7. Franklin also challenges the performance of his counsel during the penalty phase of his trial. He charges them with failing to conduct a meaningful investigation prior to the penalty phase and, thus, failing to introduce the following evidence, to wit:

1. Franklin's parents separated when he was an infant, and his father has had a number of girlfriends, fathering children with a number of those relationships. Additionally, Petitioner had minimal contact with his father during his childhood, who was uninvolved in his discipline.

2. Franklin also had minimal contact with his mother, who worked full-time

---

Petitioner on the aspect of his First Claim with which he raised the issue of juror bias. *See* Footnote 1, *supra.* The Petitioner has not objected to the recommendation of the Magistrate Judge that he be denied the requested relief on the remaining aspects of that claim. Based upon its independent review of the record, this Court concurs with that recommendation and will decline to issue a certificate of appealability on same.

6. Parenthetically, it would be futile to grant a certificate of appealability on any one or more or all of those 20 claims, since objecting to a Magistrate Judge's Report and Recommendations is a predicate to appellate review. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir.1981).

for Ford Motor Company as well as other jobs on a part-time basis. As a consequence, she did not have the energy to discipline her son and tended to give him money and other material objects to compensate for her lack of personal contact with him.

3. Since his mother and father did not spend time with Petitioner during his childhood, he was raised by his grandmother and great grandmother, who used a "switch" to discipline him.

4. Franklin was a hyperactive child who would attempt to put sugar on his vegetables. His mother had to keep him away from sweets.

5. Franklin had a bowel control disorder, which persisted into his teenage years and required him to wear a diaper. This subjected him to ridicule, and he occasionally skipped school to avoid the ridicule.

6. Petitioner's mother has a history of psychiatric illness, including two hospitalizations for depression which occurred *after* the Petitioner had been convicted and the jury had recommended that he be sentenced to death.[7]

7. At the age of 15, Franklin was referred to a rehabilitation program, after having been arrested for selling marijuana.

8. Petitioner's mother sent him to live with his grandfather during his junior year, since she did not believe that she was able to provide him with appropriate discipline. Moving to live with his grandfather caused Franklin to transfer schools. He was unable to keep up with the demands of his new school, which resulted in his failing. His failure made him ineligible to participate in sports which infuriated him. Franklin lost all motivation for school and began spend-

ing time with his cousin who was no longer in school and was involved in criminal activities. Petitioner dropped out of school at the end of his junior year.

9. The administration of the Wechsler Adult Intelligence Scale Revised showed that the Petitioner's intellectual functioning fell in the low average range. In addition, his vocabulary and mathematical skills are limited. He tends to have difficulty with abstract concepts, and his poor performance in school reflects both limited ability and limited skills. An area of potential strength is Petitioner's ability to understand social situations and to establish a conventional response to a social dilemma. In light of his overall performance, however, it is likely that Petitioner may have difficulty applying this knowledge and may act inappropriately in spite of his social awareness.

10. Petitioner's employment history included a stint with a bakery and brief periods with different fast food restaurants. His longest period of employment was for approximately one year in the dietary department of a nursing home. Petitioner enjoyed working with and talking to the elderly residents of that facility. As a consequence, he pursued certification as a nursing assistant when he joined the Job Corps.

Doc. # 108 at 7–9; Doc. # 114 at 7–9.

As a means of analysis, the Court will initially set forth the standards which it must apply to determine whether the Petitioner's convictions and sentences are unconstitutional, due to the alleged ineffectiveness of his trial counsel, following which it will apply those standards to the

---

**7.** The Petitioner was convicted and the jury recommended that he be sentenced to death in December, 1988. His mother was hospitalized in 1989 and 1991.

alleged shortcomings of counsel set forth above.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the standards which must be applied whenever a person convicted of a crime asserts that he was denied effective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052. In *United States v. Fortson,* 194 F.3d 730 (6th Cir. 1999), the Sixth Circuit elaborated upon the first prong of that test:

> We "presume from the outset that a lawyer is competent, and[,] therefore, 'the burden rests on the accused to demonstrate a constitutional violation.'" *Pierce,* 62 F.3d at 833 (quoting *United States v. Cronic,* 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Moreover, in applying *Strickland,* "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

> The trial process contains a myriad of complex decisions that, for strategic reasons, are sound when made, but may appear unsound with the benefit of hindsight. The defendant, thus, must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

*Id.* at 736.

■ The Court cannot conclude that the failure of trial counsel to canvass the neighborhood in which the murder occurred and, thus, their failure to discover Jay Lazarus, rendered their performance deficient. As is discussed below, Petitioner's trial counsel requested on two occasions that an investigator be appointed at public expense. However, those requests were rejected by Judge Winkler. The Petitioner has cited no authority for the proposition that, in order to avoid being deemed to be constitutionally deficient, counsel, who have unsuccessfully attempted to secure the services of an investigator, must themselves canvass the neighborhood in which a crime occurred, in order to discover unknown witnesses who may be able to provide exculpatory testimony. This is not an instance where a criminal defendant's trial counsel neglect to interview witnesses who have been identified to them. On the contrary, trial counsel did not know that Jay Lazarus existed or that he could have provided testimony which the Petitioner believes to be exculpatory.[8]

---

8. As is discussed below, the prosecution was aware of Jay Lazarus. Petitioner contends that the prosecution violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, by failing to disclose the information Jay Lazarus gave to police officers. That failure is part of the Petitioner's Eighth and

■ With respect to the failure of trial counsel to obtain an expert to challenge the fingerprint evidence, the Petitioner suggests that the state's evidence concerning the fingerprint went unchallenged, as a result of trial counsel's failure to secure an expert. Judge Merz concluded that, assuming for sake of argument that this claim was not procedurally defaulted, the representation by trial counsel was not deficient, because they adequately challenged that evidence through the cross-examination of the prosecution witnesses. Doc. # 105 at 203. The Magistrate Judge also pointed out that the Petitioner had failed to explain what favorable evidence would have been brought out, if a fingerprint expert had been retained. *Id.* Thus, the prejudice prong of *Strickland* was not met. *Id.* This Court agrees with Judge Merz's reasoning in that regard and concludes that, assuming the Petitioner's ineffective assistance of trial counsel claim predicated upon their failure to obtain a fingerprint expert has not been procedurally defaulted, trial counsel's performance was not deficient and there is no showing that the failure to obtain such a witness caused the Petitioner to suffer prejudice.

■ With respect to the alleged shortcomings of trial counsel in the penalty phase of the trial, some of the information which Petitioner claims his counsel should have presented during the penalty phase was presented during that phase of the trial. Thus, as Judge Merz pointed out, the jury was informed during the penalty phase that Franklin's parents were separated when he was young, that he had a bowel disorder, that he had moved in with his grandfather during his teen years as a result of his mother's inability to control

him and that he enjoyed his job in the nursing home working with the elderly residents. In addition, the jury was informed about his overall work history. Doc. # 105 at 209. The fact that trial counsel failed to present evidence during the penalty phase of the hospitalizations of Petitioner's mother for depression does not constitute deficient performance, since those hospitalizations occurred after the penalty phase of the trial occurred. With respect to the other alleged shortcomings of counsel, Judge Merz pointed out that Franklin had the burden of proving that the performance of his trial counsel was deficient, as a result of their failure to conduct an adequate investigation. Doc. # 105 at 210. Even though trial counsel testified during the evidentiary hearing, Judge Merz noted that they were not asked to describe the steps they took to investigate the mitigation factors which could be presented to the jury during the penalty phase or whether any tactical or strategic reasons had caused them to omit any of these matters from their presentation to the jury. *Id.* Thus, the Magistrate Judge concluded that the Petitioner had failed to show that trial counsel failed to "make some effort at an independent investigation in order to make a reasoned, informed decision" (*Carter v. Bell*, 218 F.3d 581, 596 (6th Cir.2000)) respecting the presentation of such evidence during the penalty phase. This Court concurs fully with the Magistrate Judge's reasoning in that regard. Moreover, even if it disagreed, the Petitioner would not be entitled to the requested relief. A claim of ineffective assistance of counsel requires that prejudice be demonstrated, in addition to showing that counsel's performance was deficient. Simply stated, this Court

Thirteenth Claims, which are discussed below. Parenthetically, the Court concludes that the prosecution did not violate *Brady* in that regard, because the information Jay Lazarus would have provided was not material. Based upon that same reasoning, the Jay Lazarus information would not be material under a *Strickland* analysis.

cannot conclude that the alleged shortcomings of trial counsel during the penalty phase resulted in a trial the result of which was not reliable.

In sum, the Court concludes that the Petitioner was not denied effective assistance of counsel during his trial. Accordingly, the Court overrules Petitioner's Objections (Docs. # 108 and # 114) to the Report and Recommendations (Doc. # 105) and Amended Supplemental Report and Recommendations (Doc. # 112), as they relate to the Second Claim. However, since "reasonable jurists [c]ould find the district court's assessment of the constitutional claims debatable or wrong," the Court will grant a certificate of appealability on this claim.

## B. Third Claim

■ With his Third Claim, the Petitioner contends that his convictions and death sentence are void, because the trial court refused to appoint an investigator, in violation of the Due Process Clause of the Fourteenth Amendment.[9] Judge Merz recommended that the Court deny this claim, because the Petitioner had not exhausted it and could not demonstrate cause and prejudice, given that the failure to appoint an expert did not deprive him of due process of law. *See* Doc. # 105 at 53–57. For reasons which follow, this Court agrees. The Court begins by examining

the right the Petitioner seeks to enforce with this claim.

In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Ake was charged and convicted of two counts of capital murder. Prior to his trial, Ake's counsel had indicated that his client wanted to raise an insanity defense and requested that the court appoint a psychiatrist or provide funds for one, since his client was indigent and without funds to hire such an expert. The trial court denied that request and the Oklahoma appellate court affirmed. Upon further appeal, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment mandates that the state provide a psychiatrist's assistance to an indigent defendant who "has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial." *Id.* at 74, 105 S.Ct. 1087. Ake had made such a showing, since he was found to be incompetent to stand trial shortly after having been arrested, being diagnosed as a paranoid schizophrenic, and was returned to competence as a result of being prescribed an antipsychotic drug. In *Mason v. Mitchell,* 320 F.3d 604 (6th Cir.2003), the Sixth Circuit noted that *Ake* was one of a number of cases which stand for the proposition that "indigent prisoners are constitutionally entitled to the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Id.* at 615 (internal quo-

---

9. In support of this claim, the Petitioner also cites the Equal Protection Clause of the Fourteenth Amendment, as well as the Fifth, Sixth and Eighth Amendments. Given that this claim is based upon *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), wherein the Supreme Court held that the Due Process Clause requires that the prosecution provide expert assistance to an indigent defendant under certain circumstances, and, further, since the Petitioner has failed to cite authority in support of the other constitu-

tional provisions, the Court limits its discussion to the question of whether the denial of an investigator constituted a denial of due process in violation of the Fourteenth Amendment. The Petitioner also cites provisions of Ohio law to support this claim. However, since a federal court cannot issue a writ of habeas corpus on the basis of "a perceived error of state law," (*Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)), the Court does not discuss the state law cited by the Petitioner.

tation marks and citation omitted).[10]

In *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), a case decided about four months after *Ake*, the Supreme Court revisited the issue of when due process requires that the state pay for expert assistance to an indigent defendant.[11] Therein, the Supreme Court wrote:

> Petitioner also raises a challenge to his conviction, arguing that there was constitutional infirmity in the trial court's refusal to appoint various experts and investigators to assist him. Mississippi law provides a mechanism for state appointment of expert assistance, and in this case the State did provide expert psychiatric assistance to Caldwell at state expense. But petitioner also requested appointment of a criminal investigator, a fingerprint expert, and a ballistics expert, and those requests were denied. The State Supreme Court affirmed the denials because the requests were accompanied by no showing as to their reasonableness. For example, the defendant's request for a ballistics expert included little more than "the general statement that the requested expert 'would be of great [necessity].'" 443 So.2d 806, 812 (1983). Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision. Cf. *Ake v. Oklahoma*, 470 U.S. 68, 82–83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (discussing showing that would entitle defendant to psychiatric assistance as matter of federal constitutional law). We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought.

*Id.* at 323–24 n. 1, 105 S.Ct. 2633.

Herein, the Petitioner requested the assistance of an investigator with a pretrial motion, which indicated, in its entirety:

> Now comes the Defendant, George T. Franklin, by and through his undersigned counsel, and hereby states that he is indigent and does so move the Court to appoint investigative services, experts and any other services as are reasonably necessary to assist in the proper representation of the Defendant in the above captioned cause. Furthermore, Defendant moves the Court that payment of fees and expenses for said services be paid at public expense.

Trial Court Docket No. 6. Judge Winkler overruled that motion, and the Petitioner renewed his request during a pretrial proceeding conducted on November 17, 1988. At that time, Petitioner's counsel argued:

> The final motion I want to bring to the court's attention that's been previously overruled is the motion for investigative services. Quite frankly, this county doesn't have the investigative services that the Public Defender's Office probably should have. It's our position we have done the best we can do with the limited resources available to Mr. Schmidt [Petitioner's co-counsel] and myself to conduct an investigation and contact witnesses and check things out, if you will, but I think in a capital case that there's no question when you have a defendant who's indigent, who

---

**10.** In *Mason,* a death penalty habeas case, the Sixth Circuit held that the Ohio Supreme Court had not unreasonably applied *Ake* when it denied the petitioner a soil and debris expert, a shoe-print expert, a mitigation investi-

gator and an independent mental health expert.

**11.** Both *Ake* and *Caldwell* were written by Justice Marshall.

has appointed counsel, that investigative services can be extremely beneficial in tracking down people we can't find who could be very essential witnesses to the defense.

In comparison, we have the State of Ohio, represented by the prosecution, and I don't remember exactly how many law enforcement officials there are in this county anymore, somewhere around a thousand Cincinnati police officers who can or could be available to the state through the auspices of whatever officer they want to ask. That puts the defense, obviously, at a distinct disadvantage. So we're asking the court to reconsider the granting of the motion for investigative services so we can, even at this date, get proper assistance to help us prepare the case.

Transcript of November 17, 1988 Proceeding at 12–13.

As can be seen, Petitioner's counsel merely indicated during the November 17th proceeding that an investigator could be beneficial in tracking down witnesses who might be essential. Simply stated, the oral and written statements of Petitioner's counsel are "little more than undeveloped assertions that the requested assistance would be beneficial" (*Caldwell*), rather than constituting the preliminary showing required by *Ake*. In any criminal prosecution, defense counsel might state that an investigator could be helpful, as did Petitioner's trial counsel. If that constituted the preliminary showing required in *Ake*, then the Due Process Clause would require the appointment of an investigator to assist every indigent defendant charged with a crime. In *Moore v. Kemp*, 809 F.2d 702 (11th Cir.) (*En banc*), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987), the Eleventh Circuit rejected such a proposition, writing:

*Ake* and *Caldwell*, taken together, hold that a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.

*Id.* at 712. In *Thacker v. Rees*, 1988 WL 19179 (6th Cir.1988), the Sixth Circuit followed the analytical framework set forth in *Moore. Accord, Frazier v. Mitchell*, 188 F.Supp.2d 798, 849 (N.D.Ohio 2001).

Since the Petitioner failed to make a preliminary showing that he needed the assistance of an investigator, this Court cannot conclude that he suffered a deprivation of due process, as a result of being denied the appointment of such assistance at public expense. Accordingly, the Court overrules Petitioner's Objections (Docs. # 108 and # 114) to the Report and Recommendations (Doc. # 105) and Amended Supplemental Report and Recommendations (Doc. # 112), as they relate to the Third Claim. Moreover, since no "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," the Court declines to grant a certificate of appealability on this claim.

### C. Fifth Claim

With his Fifth Claim, the Petitioner alleges that his convictions and sentences are void because he was denied his right to a representative jury under the Sixth and Fourteenth Amendments. In particular, he contends that the prosecution violated

*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using two of its peremptory challenges to exclude prospective jurors who are African–Americans. Judge Merz recommended that the Court deny this claim, because the Petitioner had not exhausted same, due to his failure to raise it in his direct appeals, and could not demonstrate cause and prejudice for that default. The Petitioner had argued that the ineffective assistance of his appellate counsel, in failing to raise the *Batson* claim during his direct appeals, established cause and prejudice. Judge Merz disagreed, concluding that Franklin had failed to meet the prejudice prong of a claim of ineffective assistance since the prosecution had not violated equal protection by exercising those two challenges. *See* Doc. # 105 at 63–76. For reasons which follow, this Court agrees. The Court begins by setting forth the standard it must apply to resolve this claim, following which it examines the facts and circumstances giving rise to it.

In *Batson,* the Supreme Court held that the prosecution violates the Equal Protection Clause of the Fourteenth Amendment, by challenging prospective jurors solely on the basis of their race. In *United States v. Copeland,* 321 F.3d 582 (6th Cir.2003), the Sixth Circuit reviewed the standards which are applicable to a *Batson* challenge:

> In *Batson,* the Supreme Court held that a prosecutor is precluded from exercising a peremptory challenge on the basis of race. Under *Batson,* once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination, the burden shifts to the government to demonstrate a race-neutral reason for the exclusion of the juror. The government is not required to persuade the court that its reasons for dismissing the juror were well-founded; rather, it need only demonstrate that its reasons were race-neutral. *United*

*States v. Humphrey,* 287 F.3d 422, 438 (6th Cir.2002). Once the government offers a race-neutral justification, "the challenging party must demonstrate that the purported explanation is merely a pretext for a racial motivation." *McCurdy v. Montgomery County,* 240 F.3d 512, 521 (6th Cir.2001). The burden of persuasion always rests with the opponent of the strike. *Id.*

*Id.* at 599. Herein, since the prosecution was required to identify the race-neutral reasons for challenging the two prospective jurors and the trial court ruled on the ultimate question of whether there was intentional discrimination, the preliminary issue of whether the Petitioner made a prima facie showing of discrimination becomes moot. *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Lancaster v. Adams,* 324 F.3d 423 (6th Cir.2003). Moreover, it bears emphasis that this Court is ruling upon a request for a writ of habeas corpus, predicated in part on the allegation that the prosecution violated *Batson* by peremptorily challenging two prospective jurors who are African–Americans. In *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), a habeas action raising a *Batson* challenge, the Supreme Court noted that the state court's factual finding of no discrimination is presumed to be correct. *Id.* at 769, 115 S.Ct. 1769. *Accord, Johnson v. Gibson,* 169 F.3d 1239, 1248 (10th Cir.), *cert. denied,* 528 U.S. 972, 120 S.Ct. 415, 145 L.Ed.2d 324 (1999); *Kelly v. Withrow,* 25 F.3d 363, 367 (6th Cir.), *cert. denied,* 513 U.S. 1061, 115 S.Ct. 674, 130 L.Ed.2d 607 (1994).

During Petitioner's trial, at the conclusion of the voir dire, the parties exercised their peremptory challenges. The prosecution exercised two of its challenges to exclude prospective African–American jurors, Mr. Colston ("Colston")

and Mrs. Fowler ("Fowler").[12] Franklin's trial counsel objected, and requested that Judge Winkler require the prosecution put its reasons for exercising those challenges on the record. Judge Winkler acceded to that request. The prosecutor explained that, during the first day of voir dire, Colston had indicated that serving on a jury could cause him a problem with his employment, that he had heard something about the case in the media which could cause him a problem and that he knew some police officers. Trial Transcript at 658. However, those problems seemingly disappeared on the second day, when Colston appeared to the prosecutor to be unusually anxious to be selected as a juror. *Id.* Simply stated, Colston was challenged because he seemed to be unusually anxious to serve as a juror. *Id.* The prosecutor explained that Fowler had been challenged because she immediately indicated that she felt sorry for the defendant, when she learned that she might be sitting on a death penalty case. *Id.* at 661. The prosecutor also explained that Fowler had been challenged, because she had worked as a cook for a number of years in a synagogue. *Id.* Although the prosecutor did not know how she had been treated in that employment, he assumed that she had been treated badly at times. *Id.* Since the victim was Jewish, the prosecutor decided to challenge Fowler. *Id.* Based upon the prosecution's explanations, Judge Winkler excused each of the challenged jurors, thus indicating that the prosecution had not engaged in intentional discrimination by exercising those peremptory challenges.

With respect to Colston, the Petitioner argues that other jurors who expressed similar problems were not the subject of peremptory challenges exercised by the prosecution. Juror Bostic admitted that he had an employment conflict, that he knew police officers and that he had been exposed to media coverage of the case. Juror Sikorski admitted to the possibility of employment problems and to exposure of media coverage. Juror Bergh stated that he had been exposed to the case at Proctor & Gamble, where he and Strauss had worked in different divisions of the advertising department; and that his brother-in-law was a police officer. As the Petitioner argues, the prosecution did not challenge those prospective jurors, who were not African-Americans. The flaw in the Petitioner's argument is that it is based upon a misperception of the nature of the prosecutor's explanation for challenging Colston. The prosecutor did not challenge Colston because serving on the jury could cause him an employment problem, he knew police officers and had been exposed to the case through pretrial publicity. Rather, the prosecutor excused Colston because he indicated during the first day of voir dire that the foregoing might cause him problems with jury service, while those problems seemingly disappeared the second day, which caused the prosecution to believe that he had an unusual desire to be on the jury. The Petitioner has not pointed to a single white juror who underwent a transformation similar to Colston's, yet was not peremp-

12. The prosecution did not exercise a preemptive challenge to exclude a third African-American juror. Of course, the presence of an African-American on the jury does not preclude a finding that the prosecution excluded other jurors because of their race. *United States v. Harris*, 192 F.3d 580, 587 (6th Cir.1999). Therein, the Sixth Circuit indicated that the fact that one African-American was seated on the jury, standing alone, did not warrant the finding that the defendant had failed to prove that the prosecution had intentionally discriminated against other jurors on the basis of their race. *Id.* The *Harris* court did not, however, suggest that the fact that the prosecution allowed one African-American to remain on the jury was irrelevant to that question.

torily challenged by the prosecution. As a consequence, the Court concludes that the Petitioner has failed to overcome the presumption of correctness with respect to Judge Winkler's decision to permit the prosecutor to exercise a peremptory challenge and excuse Colston.

■ With respect to Fowler, the Petitioner has failed to identify a white, prospective juror who was not peremptorily challenged by the prosecution after indicating that he or she felt sorry for the defendant because the death penalty was being sought. Nevertheless, the Petitioner points out that Fowler also indicated that she felt sorry for the victim. However, the Petitioner has not pointed to a white, prospective juror who was not challenged by the prosecution, after indicating that he or she felt sorry for both the Petitioner and the victim. Thus, the prosecution's initial reason for challenging Fowler was race-neutral. It bears emphasis that, in *Batson,* the Supreme Court said that a prosecutor's explanation for exercising a particular peremptory challenge need not rise to the level justifying the exercise of a challenge for cause. 476 U.S. at 97, 106 S.Ct. 1712. *See also, United States v. Tucker,* 90 F.3d 1135, 1142–43 (6th Cir.1996). Therefore, the fact that Fowler may have been impartial, due to her feeling sorry for both the Petitioner and the victim, is not dispositive of the *Batson* question. The other stated reason for challenging Fowler, that she may have been treated badly during her employment in synagogues, thus causing her to be unsympathetic to Strauss, the Jewish victim, is in part a product of the prosecutor's imagination, since he conceded that he did not know how she had been treated in her employment. Nevertheless, that reason is race-neutral, given that the Peti-

tioner has not identified a similarly situated white, prospective juror who was not peremptorily challenged by the prosecutor. Accordingly, the Court concludes that the Petitioner has failed to overcome the presumption of correctness with respect to Judge Winkler's decision to permit the prosecutor to exercise a peremptory challenge and excuse Fowler.

Accordingly, the Court overrules Petitioner's Objections (Docs. # 108 and # 114) to the Report and Recommendations (Doc. # 105) and Amended Supplemental Report and Recommendations (Doc. # 112), as they relate to the Fifth Claim. However, since "reasonable jurists [c]ould find the district court's assessment of the constitutional claims debatable or wrong," the Court grants a certificate of appealability on this claim.

### D. Eighth and Thirteenth Claims

With these two claims, the Petitioner contends that the prosecution violated its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, by withholding favorable evidence from him. Judge Merz recommended that this Court reject the Respondent's assertion that these claims are procedurally defaulted and deny them on the merits.[13] As a means of analysis, this Court will briefly review the jurisprudence pertaining to *Brady* and its progeny, following which it will turn to the parties' arguments concerning this issue.

■ As the Sixth Circuit has noted, *Brady* did not create a general constitutional right to discovery in criminal cases; rather, the rule established therein "is concerned only with cases in which the government possesses information which the defendant does not, and the government's

---

**13.** The Respondent has not objected to the Magistrate Judge's recommendation that the

Court decline to find these claims procedurally defaulted.

failure to disclose the information deprives the defendant of a fair trial." *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir.1994). *Brady* imposes upon the government "an obligation 'to turn over evidence in its possession that is both favorable to the accused and *material to guilt* ....' " *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir.1991) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)) (emphasis supplied by the Sixth Circuit). In *Schledwitz v. United States*, 169 F.3d 1003 (6th Cir. 1998), the Sixth Circuit elaborated upon the materiality requirement of *Brady:*

> When the defendant, as in this case, asserts that the newly discovered *Brady* evidence is exculpatory, the defendant will be entitled to a new trial if he shows that the favorable evidence at issue was "material." *United States v. Frost*, 125 F.3d 346, 382 (6th Cir.1997). In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court clarified the "materiality" analysis. The Court explained that a showing of materiality does not require the suppressed evidence in question establish the defendant's innocence by a preponderance of the evidence. Rather, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434, 115 S.Ct. 1555; *Frost*, 125 F.3d at 382–83. Nor does the defendant need to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434–35, 115 S.Ct. 1555; *United States v. Smith*, 77 F.3d 511, 515 (D.C.Cir.1996) (materiality requirement is not a sufficiency-of-the-evidence test).

> Instead, any favorable evidence, regardless of whether the defendant has made a request for such evidence, is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)); *Frost*, 125 F.3d at 382. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375; *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir.1988). Moreover, in determining whether undisclosed evidence is material, the suppressed evidence is considered collectively, rather than item-by-item, to determine if the "reasonable probability" test is met. *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555; *Frost*, 125 F.3d at 383.

*Id.* at 1011–12. In addition, "*Brady* recognizes no distinction between evidence which serves to impeach a government witness' credibility and evidence which is directly exculpatory of the defendant. Both are 'evidence favorable to the accused' and must be disclosed." *Mullins*, 22 F.3d at 1372. *See also Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady*]"). The Sixth Circuit has said that "[n]o *Brady* violation exists where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.' " *United States v. Clark*, 928 F.2d 733, 738 (6th Cir.) (quoting *United States v. Grossman*, 843 F.2d 78, 85 (2nd Cir.1988), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 864, 102

L.Ed.2d 988 (1989)), *cert. denied,* 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991). *See also, Mullins,* 22 F.3d at 1371–72 ("*Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial"); *United States v. Todd,* 920 F.2d 399, 405 (6th Cir.1990). Moreover, the Sixth Circuit has indicated that there is no violation of *Brady,* unless the undisclosed materials would have led directly to the discovery of admissible evidence. *Phillip,* 948 F.2d at 249–50.

▄ The Petitioner argues that the prosecution violated *Brady* and its progeny, by failing to disclose exculpatory information and information which he could have used to impeach prosecution witnesses. In his Objections, the Petitioner asserts that the prosecution violated *Brady* by withholding evidence that someone other than himself was spotted near the scene of the murder around the time it occurred, evidence which could have been used to impeach important witnesses and by withholding evidence that a jailhouse informant was offered a deal in exchange for his testimony. Doc. # 108 at 22; Doc. # 114 at 22. The Petitioner contends that the cumulative effect of this evidence undermines confidence in the verdict and, therefore, warrants habeas relief. *Id.* As a means of analysis, the Court will address these contentions in the above order.

During their investigation of the murder of Strauss, police officers interviewed Jay Lazarus ("Lazarus"), a student at Cincinnati Technical College who lived near Strauss' residence. Lazarus stated that he

had walked to a local grocery store at about midnight on Sunday, August 7, 1988, although he was not positive about the time.[14] On the way back to his apartment, Lazarus had seen an African–American male on the east side of Strauss' condominium.[15] Lazarus described that individual as being about thirty years of age and 5'6", as well as having a stocky build and curly middle length hair. Lazarus also reported that he believed that he was awakened by a noise later that night and looked out and saw a different African–American male in a wooded area behind Strauss' residence, where some property which had been stolen therefrom was subsequently found.

Petitioner argues that the prosecution violated *Brady* by failing to disclose the information Lazarus had provided to police, because that information could have been used to convince the jury that someone else had murdered Strauss. Judge Merz recommended that the Court reject this aspect of Petitioner's *Brady* claim, because the information provided by Lazarus was not material. Doc. # 105 at 105–06. Judge Merz pointed out that there is nothing in the record which indicates that the description of the first person seen by Lazarus was incompatible with Franklin in August, 1988. Although Franklin was only twenty-two years of age during that month and Lazarus indicated that the first person he saw appeared to be thirty, there is no evidence in the record that the Petitioner did not appear to be a thirty year old person in August, 1988. In other words, Petitioner's premise that the first person Lazarus saw was someone other than himself is not borne out by the record. Lazarus was not certain of the date upon which

---

**14.** Strauss was last seen by a neighbor around 11:00 p.m., on Saturday, August 6, 1988; therefore, Lazarus may have seen the individual on the east side of Strauss' condominium around the time of the murder.

**15.** One could enter Strauss' condominium from the east side where the patio was located.

he saw the other individual, although he thought he saw that individual on August 8th, as well. Since it is not known whether the first person seen by Lazarus matched the Petitioner's description and on what date he saw the second person, the Court agrees with Judge Merz that "there is [no] reasonable probability that, had the evidence [provided by Lazarus] been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555. Accordingly, that information is not material and the failure to disclose it did not violate *Brady*.

■ During the trial, Michael Turnbolt ("Turnbolt") testified on behalf of the prosecution that he spent the evening, upon which Strauss was murdered, doing drugs with the Petitioner, who left around 10:30 p.m. Turnbolt next saw the Petitioner the following morning around 2:30. At that time, the Petitioner had changed his shirt and had a number of $20 bills, which he had not possessed earlier that evening.[16] Turnbolt did not inform police officers of the matters about which he testified until shortly before the Petitioner's trial commenced. The Petitioner contends that the prosecution violated *Brady* by failing to disclose information which could have been used to impeach Turnbolt. In particular, Franklin points out that officers were told by Ron Jones ("Jones") that Steve Boseman ("Boseman") had indicated that he was an acquaintance of Franklin and that property stolen from Strauss' residence was located in an apartment on Woodburn Avenue. Turnbolt lived in an apartment located at 2712 Woodburn Avenue. Petitioner contends that the information that someone had indicated that property sto-

len from Strauss was located in an apartment on Woodburn Avenue could have been used to impeach Turnbolt, since it might have shown that Turnbolt had a motive to provide false testimony against the Petitioner. Although the Petitioner does not identify Turnbolt's motive to testify falsely, the Court assumes that it would be to implicate the Petitioner and, thus, to direct the officers' attention away from his (Turnbolt's) connection with the theft of Strauss' possessions and, perhaps, his murder.

Judge Merz concluded that the information Jones had supplied to police officers was not material. *See* Doc. # 105 at 104–05. This Court agrees with that conclusion and adopts same. The information police had received from Jones was hearsay, and did not mention Turnbolt. Moreover, Petitioner has not supplied any admissible evidence, tending to establish that property stolen from Strauss' apartment was stored at Turnbolt's apartment on Woodburn. Thus, it bears emphasis that the prosecution failed to disclose speculation supported only by hearsay. The Petitioner has failed to suggest how that speculation could have been used at trial. *See Phillip, supra* (indicating that there is no violation of *Brady*, unless the undisclosed materials would have led directly to the discovery of admissible evidence). Petitioner could have asked Turnbolt if property stolen from Strauss was located in his apartment on Woodburn. However, it should be noted that the Petitioner's theory is that Turnbolt testified falsely during the trial and that the information supplied by Jones could be used to impeach him. Accepting for present purposes that Turnbolt testified falsely in order to direct po-

---

**16.** Turnbolt's testimony that Franklin possessed a number of $20 bills implicated the Petitioner in the murder of Strauss, because other evidence introduced at trial established

that a money clip and currency belonging to Strauss had been stolen during the burglary of his condominium.

lice attention away from his participation in the burglary of Strauss' residence, there is no reason to believe that Turnbolt would have experienced an epiphany and decided to tell the truth merely because Petitioner's counsel asked him on cross-examination whether property taken from Strauss' residence was located in his apartment on Woodburn. Thus, the Court cannot conclude that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555.

During Petitioner's trial, Larry Weaver ("Weaver"), who was incarcerated with Franklin prior to his trial, testified on behalf of the prosecution. Petitioner contends that the prosecution violated *Brady*, because it failed to disclose that Weaver had been offered consideration in exchange for his testimony. At trial, Weaver testified that the prosecution had not offered him anything in exchange for his testimony. Judge Merz recommended that the Court reject the Petitioner's claim based upon Weaver, because there was no evidence that Weaver had lied during his testimony or that the prosecution had offered him anything in exchange for it.[17] Doc. # 105 at 116–17. This Court agrees with the reasoning of the Magistrate Judge in that regard and adopts same. Accordingly, it rejects the Petitioner's argument that the prosecution violated *Bra-*

*dy* by failing to disclose promises made to Weaver in exchange for his testimony.

Considering the foregoing information withheld by the prosecution both individually and collectively, the Court concludes that "there is [no] reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555. Therefore, the information which the prosecution withheld was not material. Consequently, the prosecution did not violate its obligations under *Brady*. Accordingly, the Court overrules Petitioner's Objections (Docs. # 108 and # 114) to the Report and Recommendations (Doc. # 105) and Amended Supplemental Report and Recommendations (Doc. # 112), as they relate to the Eighth and Thirteenth Claims. However, since "reasonable jurists [c]ould find the district court's assessment of the constitutional claims debatable or wrong," the Court grants a certificate of appealability on these claims.

### E. Twentieth Claim

 With this claim, the Petitioner alleges that his convictions and sentences are void, because the trial court improperly instructed the jury during the guilt phase of the trial, in violation of the Due Process Clause of the Fourteenth Amendment.[18] The Petitioner initially set forth four alleged errors in jury instructions. In

---

**17.** The Petitioner had supported this claim with an affidavit from Warren Coaston, who was also incarcerated with Franklin. Coaston indicated that he had testified falsely before the Grand Jury that Franklin had confessed, in exchange for help from the prosecutor concerning the charges pending against him (Coaston). Coaston did not testify during Petitioner's trial. The Petitioner also provided an affidavit from Robert Penebaker, who indicated that he had been threatened by prosecutors because he had refused to testify against Franklin.

**18.** In support of this claim, the Petitioner also cites the Fifth, Sixth and Eighth Amendments. However, since this claim is based upon *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), which held that jury instructions which create conclusive presumptions of an element of an offense violate the Due Process Clause of the Fourteenth Amendment, the Court need not address the other constitutional provisions further.

his Objections, however, he challenges only the manner in which Judge Winkler instructed the jury on the meaning of "purpose." *See* Doc. # 108 at 31–32; Doc. # 114 at 32–33. Based upon its own independent review of the record, this Court concurs with Judge Merz's recommendation that the Petitioner be denied relief on the other three grounds of the Twentieth Claim. Accordingly, the Court adopts the Report and Recommendations (Doc. # 105), as that judicial filing relates to the assertions in Petitioner's Twentieth Claim that the trial court improperly defined "foreseeability," and "reasonable doubt," and that its preliminary instruction on the capital specification was improper. In addition, since the Petitioner has not shown that reasonable jurists would find this Court's assessment of those issues claims debatable or wrong, the Court will not award a certificate of appealability for any one or more or all of them. The Court now turns to the Petitioner's one objection on this claim, that Judge Winkler unconstitutionally defined "purpose."

Judge Merz recommended that the Court reject the Respondent's assertion that the Petitioner had procedurally defaulted this claim and that the Court deny relief to the Petitioner on the merits. The Respondent has failed to object to the recommendation of the Magistrate Judge that this claim is not procedurally defaulted. For reasons which follow, the Court concurs with the recommendation of Judge Merz on the merits of this claim.

Under Ohio Revised Code § 2903.01(B), the prosecution was obligated to prove, beyond a reasonable doubt, that the Petitioner acted with the purpose to kill. Petitioner contends that Judge Winkler's instructions created a conclusive presumption on that *mens rea* element. Judge Winkler instructed the jury that to find the Defendant guilty,

the jury would be required to find that Franklin "purposely caused the death of Gerald R. Strauss." Trial Transcript at 1261. Judge Winkler then defined "purpose:"

Purpose to cause death is an essential element of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to kill Gerald R. Strauss while the defendant was committing aggravated burglary.

A person acts purposely when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature.

Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing.

Now the purpose with which a person does an act is known only to himself, unless he expresses it to others or indicates it by his conduct.

So, the purpose with which a person does an act or brings about a result is determined from the manner in which it was done, the means or weapon used and all of the other facts and circumstances in evidence.

However, if a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to kill may be inferred from the use of the weapon.

Proof of motive is not required. The presence or absence of motive is one of

the circumstances bearing upon purpose. Where an act is a crime, a good motive or purpose is not a defense.

*Id.* at 1261–63. The Petitioner argues that the foregoing instruction told the jury that "purpose *is* determined: from the use of a weapon." Doc. # 108 at 31; Doc. # 114 at 32 (emphasis in the original).[19] Since this Court does not interpret the language employed by Judge Winkler in the same manner as does the Petitioner, he is not entitled to relief on this claim. Rather, the only fair interpretation of Judge Winkler's jury instruction is that purpose may be inferred from the use of the weapon, rather than being determined from same. Moreover, as is discussed below, this claim lacks legal support.

According to Franklin, such an instruction created a conclusive presumption on the question of whether he acted with the purpose to kill Gerald Strauss. In support of this assertion, he relies upon *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Therein, Sandstrom was convicted of deliberate homicide, which was defined by Montana law as purposely or knowingly taking the life of another. Over Sandstrom's objection, the trial court instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." After the Montana Supreme Court had affirmed the conviction, Sandstrom appealed to the United States Supreme Court, arguing that the quoted instruction had denied him the right to due process of law, because it created a conclusive presumption on the *mens rea* element. In *Sandstrom*, the United States Supreme Court agreed that the jury instruction had violated due process

by creating a conclusive presumption. In accordance with *Roberts v. Marshall*, 736 F.2d 1126 (6th Cir.1984), *cert. denied*, 469 U.S. 1193, 105 S.Ct. 970, 83 L.Ed.2d 974 (1985), this Court concludes that *Sandstrom* is distinguishable. In *Roberts*, the petitioner, after having been convicted of murder in violation of Ohio law, sought a writ of habeas corpus, arguing, *inter alia*, that the manner in which the trial court had defined "purpose" violated *Sandstrom*. The instruction given in *Roberts* was virtually identical to that utilized by Judge Winkler, except that the *Roberts* instruction also told the jury that "[a] person is presumed to have a purpose or design behind his voluntary acts, unless his actions are otherwise explained by the evidence." 736 F.2d at 1127. The Sixth Circuit held that this instruction was distinguishable from that given in *Sandstrom*, since the jury was not informed that it must apply a presumption or that the petitioner had a burden of proof. *Id.* at 1128.

Since *Sandstrom* is distinguishable in accordance with *Roberts*, this Court cannot conclude that Petitioner suffered a deprivation of due process, as a result of the manner in which "purpose" was defined in the instructions given to the jury during his trial. Accordingly, the Court overrules Petitioner's Objections (Docs. # 108 and # 114) to the Report and Recommendations (Doc. # 105) and Amended Supplemental Report and Recommendations (Doc. # 112), as they relate to the Twentieth Claim. Moreover, since no "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," the Court declines to

---

**19.** The Petitioner also argues that the second paragraph from the instructions on purpose, quoted above, was unnecessary under state law. Since this Court is without authority to

grant a writ of habeas corpus for violations of state law (*Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)), it declines to address that argument.

grant a certificate of appealability on this claim.

## III. Respondent's Objections (Doc. # 106)

█ Judge Merz recommended that the Court grant the Petitioner a writ of habeas corpus on his Sixth Claim, with which he alleged that his convictions and sentences were void, because service on the jury by a biased juror deprived him of the right to a fair and impartial jury, as guaranteed by the Due Process Clause of the Fourteenth Amendment. The Petitioner failed to present this claim during his direct appeals in state court. Nevertheless, Judge Merz recommended that this Court find that the Petitioner had shown cause and prejudice to excuse this procedural default, as a result of the ineffective assistance rendered by his appellate counsel in failing to raise the issue during Franklin's direct appeals. Judge Merz also recommended that the Court conclude that the Petitioner is entitled to the requested relief on this claim, because his convictions and sentences were unconstitutional due to the presence of a biased juror. The Respondent has objected to the Magistrate Judge's recommendations, arguing both that the Petitioner's Sixth Claim is barred by procedural default and that he is not entitled to relief on the merits of this claim, even if it has not been defaulted.

The Magistrate Judge wrote twenty pages on this claim in his Report and Recommendations (see Doc. # 105 at 76–96) and an additional five pages on it in his Amended Supplemental Report and Recommendations (see Doc. # 112 at 2–6). He also wrote twenty-five pages, resolving the question of whether Franklin's appellate counsel failed to provide effective assistance of counsel, including a discussion of the question of whether appellate coun-

sel were ineffective in failing to raise the biased juror issue during Petitioner's direct appeals. See Doc. # 105 at 174–99. The discussion of the Petitioner's Sixth Claim and the ineffective assistance of appellate counsel, set forth in the Magistrate Judge's Report and Recommendations and Amended Supplemental Report and Recommendations, is thorough, comprehensive, well written and adequately addresses the arguments raised by the Respondent in his Objections (Doc. # 106). Therefore, although this Court has conducted a de novo review of those arguments and the record before it, there is no need to "reinvent the wheel" through a written discussion of the Petitioner's Sixth Claim and the parties' arguments in support of and in opposition to same. Rather, based upon the reasoning, citations of authority and reference to the record in this matter set forth by Judge Merz in his Report and Recommendations (Doc. # 105) and in his Amended Supplemental Report and Recommendations (Doc. # 112), the Court overrules the Respondent's Objections (Doc. # 106). The Magistrate Judge's judicial filings are adopted as they relate to the Sixth Claim and to the aspect of the First Claim which is predicated on the presence of a biased juror. The Court will, however, briefly comment on one of the Petitioner's arguments.

The Respondent argues that the Magistrate Judge was incorrect in his recommendation that the procedural default of the Sixth Claim is excused by cause and prejudice, because raising a claim of ineffective assistance of appellate counsel is not the same as raising the underlying biased juror claim. See Doc. # 106 at 6–7. Although the Court agrees with Respondent that raising a claim of ineffective assistance of counsel is not the same as raising the underlying claim, it cannot agree that this is the basis for concluding

that procedural default of the Petitioner's Sixth Claim is not excused. In *Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000), the Supreme Court reiterated that a claim of ineffective assistance of counsel can serve as cause and prejudice, excusing a procedural default on the underlying claim (*i.e.*, the sequela of the ineffective assistance), as long as the ineffective assistance claim itself has not been procedurally defaulted. Based upon the reasoning and citations of authority set forth by Judge Merz in his Report and Recommendations, this Court concludes that the Petitioner did not procedurally default his ineffective assistance of appellate counsel claim. Moreover, since the Court agrees with the Magistrate Judge that Franklin's appellate counsel rendered ineffective assistance by failing to raise the juror bias issue during his direct appeals, it concludes that Petitioner has demonstrated cause and prejudice, excusing the failure to raise the issue during his direct appeals. Additionally, the decisions relied upon by the Respondent, *Lott v. Coyle*, 261 F.3d 594, 612 (6th Cir.2001) and *Buell v. Mitchell*, 274 F.3d 337, 361 (6th Cir.2001), do not cause this Court to conclude that the Petitioner failed to establish cause and prejudice. Thus, the merits of his Sixth Claim may be addressed and resolved.

Based upon the foregoing, the Court overrules the Respondent's Objections (Doc. # 106) to the Report and Recommendations (Doc. # 105) of the Magistrate Judge.

In sum, the Court concludes that, based upon his Sixth Claim and the aspect of his First Claim predicated upon failure of appellate counsel to raise the biased juror issue during his direct appeals, the Petitioner is entitled to a conditional writ of habeas corpus, which will result in his release from custody if he is not retried within 180 days. The Court adopts the Report and Recommendations (Doc. # 105) and Amended Supplemental Report and Recommendations (Doc. # 112) of the Magistrate Judge, as supplemented herein.

The Court directs that judgment be entered in favor of the Petitioner and against the Respondent on the Sixth Claim and the aspect of his First Claim predicated upon failure of appellate counsel to raise the biased juror issue during his direct appeals, and in favor of the Respondent and against the Petitioner on all other claims.

It is anticipated that Petitioner will seek leave to appeal *in forma pauperis*. Such a motion will be granted. The Petitioner is granted a certificate of appealability on his Second, Fifth, Eighth and Thirteenth Claims.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.